IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

JOHN DOE M.B.,

JOHN DOE R.F., JOHN DOE S.G.,

JOHN DOE D.L., JOHN DOE J.S.,

And JOHN DOE M.W.

    Plaintiffs,

v.

THE OHIO STATE UNIVERSITY,

    Defendant.

Case No. 2:19-cv- 01911-GCS-CMV

Judge Michael H. Watson


JURY TRIAL DEMANDED

## FIRST AMENED COMPLAINT OF RIGHT

Plaintiffs, JOHN DOE M.B., JOHN DOE R.F., JOHN DOE S.G., JOHN DOE D.L., JOHN DOE J.S, and JOHN DOE M.W., by and through their counsel, state the following as their Complaint against Defendant, The Ohio State University:

## PRELIMINARY STATEMENT AND INTRODUCTION

1. This is a civil rights case brought by former students of The Ohio State University ("OSU") who are among the estimated 1,500 to 2,500 male students sexually assaulted, abused, molested and/or harassed by OSU physician and athletic team doctor, Dr. Richard Strauss.

2. Defendant OSU employed Dr. Strauss to provide medical care and treatment to its students and student-athletes, making him an assistant professor of medicine and the official sports team doctor. OSU also employed Dr. Strauss to serve as a physician at OSU's on campus student health center.

3.  Dr. Strauss used his position of trust and confidence at OSU to sexually abuse male students and student-athletes on a regular basis throughout his 20-year tenure at the university from 1978 through 1998.

4.  Dr. Strauss's sexual abuse of OSU students included fondling their testicles and penises, digitally penetrating their rectums, touching their bodies in other inappropriate ways, making inappropriate comments about their bodies, and asking improper, sexualized questions – all in guise of providing needed medical evaluation and care.

5.  Dr. Strauss's inappropriate touching was a frequent topic of discussion and well known among OSU's student-athletes, trainers, coaches and athletic directors. This was reflected in their various nicknames for Dr. Strauss, including "Dr. Balls," "Dr. Nuts," "Dr. Jelly Paws," "Dr. Soft Hands," and "Dr. Cough."

6.  OSU learned about Dr. Strauss's inappropriate sexual conduct as early as his first year of employment there. When an attending physician at OSU's student health center asked a wrestling team captain why he came to the student health center instead of seeing Dr. Strauss, the wrestler explained that Dr. Strauss had examined his genitals for 20 minutes and appeared to be trying to get him excited.[1]

7.  Throughout Dr. Strauss's 20-year tenure at OSU, OSU administrators, coaches, physicians, and other employees were repeatedly informed about Dr. Strauss's sexual abuse of OSU students.

8.  Instead of taking action to stop Dr. Strauss's serial sexual abuse, OSU not only turned a blind eye to it, but facilitated the abuse.

---

[1] Former OSU wrestler says Richard Strauss molested him in late 1970s, earliest such allegation, July 19, 2018, https://www.cnn.com/2018/07/18/us/former-osu-wrestler-richardstrauss-molestation-allegation/imdex.html

9. For example, OSU required its student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships – even after student-athletes complained to their coaches about the ways Dr. Strauss touched them during medical examinations. And at least one coach threatened athletes with having to see Dr. Strauss if they did not listen to the coach.

10. OSU administrators and employees of Student Health Services also facilitated Dr. Strauss's abuse. For example, after a student lodged a complaint detailing Dr. Strauss's inappropriate sexual touching and comments during an examination, the Director of Student Health Services legitimized the abuse by telling the student that no one had complained about Dr. Strauss before and that Dr. Strauss had said the examination was medically appropriate.

11. OSU's institutional indifference to the rights and safety of its students—who, collectively, were exposed to decades of sexual abuse by Dr. Strauss – is staggering.

12. And it is not limited to the abuse inflicted by Dr. Strauss. OSU's culture of institutional indifference to the rights and safety of its students has permitted serial sexual predators and harassers to thrive at the university for the last four decades. There have been at least two OSU employees since Dr. Strauss who are alleged to have systematically committed sexual abuse and/or facilitated rampant sexual harassment – a former Director of OSU's Marching Band, Jonathan Waters, and an assistant diving coach, Will Bohonyi.

13. In 2014, after OSU investigated a complaint against Jonathan Waters alleging a sexualized culture within the Marching Band, OSU found that "there was a sexually

hostile environment for students in the Marching Band of which the University had notice and failed to adequately address."[2]

14. In response to its findings of sexual harassment within the Marching Band, OSU adopted a new plan for combatting sexual misconduct so that it could become "a national leader" in preventing and responding to sexual misconduct.[3]

15. Far from becoming a national leader on this issue, OSU is an example of what not to do. After receiving a report during a meet in 2014 that assistant diving coach Will Bohonyi was sexually abusing a minor in OSU's Diving Club, OSU allegedly sent the victim, not Bohonyi home from the meet.[4] In addition, OSU allegedly has failed to take action to address hundreds of naked photographs of the victim that Bohonyi forced her to take at age 16 and that have been in OSU's possession for approximately four years.[5]

16. In 2018, OSU dissolved its comprehensive sexual assault prevention and response unit after revelations that OSU employees within the unit had failed to handle students' reports of sexual assault properly and told some victims that they were "lying" and "delusional."[6]

---

[2] See Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University, 2 (Sept. 11, 2014) describing results of OSU's investigation of alleged sexual harassment within Marching Band), https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (hereinafter "OCR Findings Letter").

[3] Ohio State announces comprehensive plan to combat sexual misconduct and relationship violence, September 17, 2015, https://news.osu.edu/ohio-state-announces-comprehensive-plan- to-combatsexual-misconduct-and-relationship-violence/(hereinafter "OSU Plan").

[4] See Prior v. USA Diving, Inc., et al., S.D. Indiana, Case No. 1:18-cv-2113, Complaint ¶¶ 267- 75, ECF Doc. No. 1, accessible at https://www.courtlistener.com/recap/gov.uscourts.insd.85736/gov.uscourts.insd.85736.1.0_2.pdf (hereinafter "Diving Complaint").

[5] Id. at ¶¶ 176-80, 260-61.

[6] Ohio State closes 'failed' program, takes another hard look at Title IX policies, June 24, 2018, accessible at http://www.dispatch.com/news/20180624/ohio-state-closes-failed-program-takesanother-hard-look-at-title-ix-policies; see also, A broken system at Ohio State, July 10, 2018, accessible at https://www.insidehighered.com/news/2018/07/10/ohio- statecloses-sexual-assault-unit-after-complaints-mismanagement-poor-reporting

17. It is not surprising that OSU succeeded in keeping Dr. Strauss's two decades of serial sexual assault abuse buried until this year.

18. Plaintiffs have filed this lawsuit in the hope that OSU will fulfill its goal of becoming "a national leader" in preventing and responding to sexual misconduct by making the systemic changes needed to ensure that students can obtain their education in a safe environment free from sexual harassment and abuse by OSU employees. Plaintiffs are also seeking compensation for their injuries caused by OSU's failure to take appropriate action to stop Dr. Strauss's known sexual predation, in violation of Title IX of the Education Amendments of 1972.

## **JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 because the matters in controversy arise under the laws of the United States. Specifically, Plaintiffs assert claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred within this district.

## **PARTIES**

21. Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

_____

22. Because this Complaint addresses issues of sexual harassment and abuse, which are matters of the utmost intimacy, with the exception of certain Plaintiffs who have agreed to be publicly identified, the names of the Plaintiffs have been withheld from this Complaint to protect their identities.[7]

23. Plaintiff JOHN DOE M.B. is an adult male and a resident of Delaware, Ohio. He attended The Ohio State University from 1985 through his graduation in 1991. He was a member of OSU's wrestling team. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during an examination his sophomore year in 1986.

24. Plaintiff JOHN DOE R.F. is an adult male and a resident of Lorain, Ohio He attended The Ohio State University from 1993 through 1995. He was a member of both OSU's wrestling and football teams. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during physicals and treatments for sports related injuries.

25. Plaintiff JOHN DOE J.S. is an adult male and a resident of Chagrin Falls, Ohio. He attended The Ohio State University from 1992-1995. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss at the OSU student health center.

26. Plaintiff JOHN DOE D.L. is an adult male and a resident of Toledo, Ohio. He attended The Ohio State University from 1991-1994. He was a member of OSU's wrestling team. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during physical examinations and treatments.

27. Plaintiff JOHN DOE S.G. is an adult male and a resident of Gilbert, AZ. He attended The Ohio State University from 1994-1995. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss at the OSU student health center.

---

[7] The Plaintiffs withholding their identities in this Complaint will file a motion to use pseudonyms, as needed, and will seek an order of the Court regarding disclosure of their identities and the conditions for disclosure.

28. Plaintiff JOHN DOE M.W. is an adult male and resident of Bellaire, Ohio.  He attended The Ohio State University from 1990-1995.  He was sexually assaulted, abused, molester and/or harassed by Dr. Strauss at the OSU student health center.

29. Defendant The Ohio State University ("OSU") was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

30. Defendant OSU receives, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

## COMMON FACTUAL ALLEGATIONS

31. Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

32. OSU employed Dr. Strauss from approximately 1978 through 1998. Dr. Strauss served in various positions at OSU, including, but not limited to: assistant professor of medicine; attending physician; team physician for OSU athletics; and part-time physician with OSU's Student Health Services. He retired as a professor emeritus in 1998.

33. Dr. Strauss served as team physician for OSU athletics from approximately July 1, 1981, through June 30, 1995, where he had regular contact with male student athletes in baseball, cheerleading, fencing, football, gymnastics, ice hockey, lacrosse, soccer, swimming, diving, waterpolo, tennis, track and field, cross country, volleyball, wrestling, and golf.

34. Dr. Strauss also worked as a physician at OSU's student health center from approximately 1991 to 1995, where he had access to the entire student population, not just student athletes.

35. On information and belief, OSU removed Dr. Strauss from working at the student health center after receiving a sexual misconduct complaint from a student during the 1995-1996 academic year, but continued to employ Dr. Strauss as an assistant professor and varsity athletics physician until 1998.

36. Beginning his very first year of employment at OSU – and spanning his entire two-decade tenure – Dr. Strauss preyed on male students, fondling, groping, sexually assaulting, and harassing them. He did so with OSU's knowledge and support.

37. OSU facilitated Dr. Strauss's abuse of male student-athletes by requiring them to undergo annual physical exams with Dr. Strauss in order to participate in OSU athletics and maintain their scholarships. OSU also facilitated Dr. Strauss's abuse of male students in the general student population by making Dr. Strauss a treating physician at OSU's student health center. All in all, Dr. Strauss is estimated to have abused 1,500 to 2,500 male students and student-athletes.

38. No matter the illness or injury, Dr. Strauss's modus operandi during medical appointments was always the same.

39. He required students to remove their pants so that he could perform invasive and medically unnecessary examinations of their genitals and/or rectum.

40. He groped and fondled students' genitalia, often without gloves.

41. He performed unnecessary rectal examinations and digitally penetrated students' anuses.

42. He pressed his erect penis against students' bodies.

43. He moaned while performing testicular exams.

44. He made inappropriate and medically unnecessary comments about students' bodies, including comments on their physical appearance, heritage, skin tone, and physique. And he took pictures of students, purportedly for a musculature book he was writing.

45. One student-athlete's experience exemplifies the pattern of Dr. Strauss's sexual predation. The student recalled a physical exam with Dr. Strauss: "I'm sitting, and he straddled my thigh, mounted my thigh. Rubbed on my thigh. I was just frozen." Dr. Strauss then told the athlete to undress so that he could check, purportedly, for a hernia. Dr. Strauss proceeded to inspect the student's penis "in detail." [8]

46. The next year, the student-athlete received his physical, yet again, from Dr. Strauss. Most of the 20-minute exam involved Dr. Strauss inspecting the student's genitalia. [9]

47. The following year, the student-athlete received his physical from a different doctor. That physical lasted five minutes. There was no hernia test. The doctor did not make the student fully undress. Afterward, the student was perplexed: "Is that it?" [10]

48. The student-athlete felt at the time that Dr. Strauss's behavior was wrong. But Dr. Strauss's authority as a medical professional and OSU's official team doctor caused the student to doubt his instincts. And Dr. Strauss's elevated position at OSU made him feel powerless to stop the abuse. He felt OSU was "feeding" Dr. Strauss students.

49. Only after OSU publicly announced in 2018 that it was investigating allegations of sexual misconduct raised against Dr. Strauss (the "Investigation") did the student realize that his discomfort had been justified, his instincts correct: Dr. Strauss had sexually abused him.

---

[8] Former Ohio State athlete says he was sexually assaulted twice by former team doctor Richard Strauss, April 6, 2018, https://www.thelantern.com/2018/04/former-ohio-state-athlete-says-he-was-sexually-assaulted-twice-by-former-team-doctor-richard-strauss/
[9] *Id.*
[10] *Id.*

He was relieved to learn that he wasn't "crazy" for thinking something had been wrong.
[11]

50. The insidious nature of sexual abuse by a healthcare provider explains the student

athlete's struggle to come to terms with Dr. Strauss's abuse – and why this struggle is all

too common among victims of physician-patient abuse. Although Dr. Strauss's victims

felt that his exams were medically inappropriate and deeply uncomfortable, most of them

did not realize these exams constituted illegal sexual assault and harassment until after

OSU publicized its Investigation in 2018.

51. And not until after OSU publicized its Investigation in 2018 did Dr. Strauss's victims

learn that OSU was not only aware of his abuse but facilitated it.

### OSU's Knowledge and Facilitation of Dr. Strauss's Sexual Predation

52. OSU played a key role in normalizing and perpetuating Dr. Strauss's serial sexual abuse.

53. For instance, when Plaintiff in Case No. 2:18-cv-00736-MHW-EPD, Steve Snyder-Hill, a

former OSU student sexually assaulted by Dr. Strauss, lodged a complaint about Dr.

Strauss's misconduct, the director of OSU Student Health Services, Ted W. Grace, M.D.,

told him –falsely –that OSU had "never received a complaint about Dr. Strauss before."
[12]

54. In fact, OSU had received many complaints about Dr. Strauss before.

55. OSU learned of the abuse within Dr. Strauss's very first year of employment, in 1978.

That year, Dr. Strauss fondled another Plaintiff in Case No. 2:18-cv-00736-MHW-EPD,

---

[11] *Id.*

[12] Complaint from former Ohio State student details abuse by Strauss in 1995, July 19, 2018,
http://www.dispatch.com/news/20180719/complaint-from-former-ohio-state-student-details-abuseby-strauss-in-1995  (last visited July 26, 2018).

David Mulvin, a wrestling team captain, during a medical exam. Mulvin reported the incident to a doctor at OSU's student health center. [13]

56. The doctor did nothing. [14]

57. OSU did nothing. [15]

58. Student complaints about Dr. Strauss poured in over the years. Student-athletes informed OSU athletic administrators and staff, including, but not limited to, Athletic Director Andy Geiger, Assistant Athletic Director Archie Griffin, Track and Field Coach Frank Zubovich, Tennis Coach John Daly, Swimming Coach Dick Sloan, and Fencing Coach Charlotte Remenyik, that Dr. Strauss's conduct seemed inappropriate and made them uncomfortable.

59. Griffin, Zubovich, Daly, and Sloan did not take any action in response to the athletes' complaints about Dr. Strauss.

60. Upon information and belief, Remenyik reported Dr. Strauss's suspected sexual abuse to higher authorities at OSU, but OSU did not take any corrective or disciplinary action against Dr. Strauss.

61. Dr. Strauss's unorthodox touching during medical exams was such common knowledge that OSU's coaching staff, trainers, and student-athletes knew him as "Dr. Jelly Paws," "Dr. Nuts," "Dr. Soft Hands," and "Dr. Cough"- names that reflect his sexual predation.

62. OSU's coaching staff, including tennis coach John Daly, regularly joked about Dr. Strauss's examinations of male athletes. Daly threatened student-athletes that they would

---

[13] Former OSU wrestler says Richard Strauss molested him in late 1970s, earliest such allegation, July 19, 2018, http://www.cnn.com/2018/07/18/us/former-osu-wrestler-straussmolestation-allegation/index.html  (last visited July 22, 2018).

[14] *Id.*
[15] *Id.*

have to see Dr. Strauss, if they did not do what the coach asked. He also laughed about it being a student's "turn to see Dr. Strauss."

63. Dr. Strauss's inappropriate examinations were well-known and discussed openly among OSU administrators, staff, and student-athletes.

64. Rather than take the flood of complaints about Dr. Strauss seriously, OSU continued to require students to be treated by him, thereby supplying him an endless trough of victims.

65. Indeed, OSU told student-athletes that if they wanted to keep their scholarships or continue playing for OSU, they had to go to Dr. Strauss for their annual physical exams and medical treatment.

66. Many of Dr. Strauss's victims were student-athletes on full scholarship, making them particularly vulnerable to his abuse. OSU's requirement that athletes be examined and treated by Dr. Strauss forced them into an impossible Hobson's choice: either suffer through Dr. Strauss's deeply uncomfortable, questionable examinations or forego their scholarships and educations.

67. OSU's requirement also put student-athletes in the unbearable position of choosing between their physical health in the short term and their psychological, emotional, and physical well-being in the long-term.

68. For instance, one student-athlete – an All-American wrestler – recalled that whenever he was injured, he had to decide: "Is this injury bad enough that I'm going to get molested for it?" [16]

---

[16] Ex-athletes say Ohio State doc groped, ogled men for years, July 7, 2018,
https://www.sfgate.com/news/education/article/Ex-athletes-say-Ohio-State-doc-groped-ogled- men13053149.php

69. Dr. Strauss's abuse – which OSU allowed to continue unchecked throughout his long tenure – has traumatized many survivors for decades. Indeed, many survivors continue to be afraid to see doctors to this day, causing them to jeopardize their health and receive dangerous diagnoses late.

70. Dr. Strauss did not limit his abuse to the privacy of the exam room. He reigned over the locker rooms of Larkins Hall, the former OSU recreation center, where – in full view of OSU's coaching staff and other employees – he harassed male student-athletes.

71. He read the newspaper naked in the male locker room, so that he could stare at student-athlete bodies.

72. He showered with student-athletes for hours at a time and several times a day.

73. On one occasion, he finished showering and was preparing to leave the locker room when one of his "favorite" wrestlers began to shower. Dr. Strauss undressed and joined the wrestler in the shower. [17]

74. Yet again, male student-athletes complained to OSU about Dr. Strauss's conduct.

75. Yet again, OSU had an opportunity to stop the abuse, but did nothing.

76. And so, Dr. Strauss continued to terrorize OSU students with impunity.

77. Following Dr. Strauss's lead, other OSU employees took full advantage of OSU's indifference to sexual harassment and abuse.

78. For instance, some trainers were so "touchy feely" with the student-athletes that the athletes developed a practice of informing each other about which trainers to avoid.

---

[17] See John Doe, et al. v. The Ohio State University, S.D. Ohio No. 2:18-cv-00692, First Amended Class Action Complaint, ECF No. 33 (Oct. 26, 2018) ("Class Action Complaint"), ¶ 135. Case: 2:18-cv-00736-MHW-EPD Doc #: 27 Filed: 11/13/18 Page: 19 of 182 PAGEID #: 229

79. A cohort of "voyeurs" flocked to Larkins Hall to gawk at the OSU student-athletes and masturbate while watching them shower. [18]

80. One wrestling head coach, Russ Hellickson, described the toxic culture at OSU as a "cesspool of deviancy." [19] He recalled that, "Coaching my athletes in Larkins Hall was one of the most difficult things I ever did." [20]

81. At times, Coach Russ Hellickson had to physically drag the voyeurs out of Larkins Hall. [21] Though he pleaded with OSU to move the athletes to a private building, [22] his pleas fell on deaf ears. Yet again, OSU did nothing to stop the abuse and harassment.

82. During the 1994-1995 academic year, student-athletes complained to then-Athletic Director Andy Geiger about the inappropriate sexual behavior in Larkins Hals, including that of Dr. Strauss. Geiger promised to look into the situation, but OSU did nothing to make the athletes safer. [23]

83. Instead, OSU continued doing business as usual, allowing student-athletes to be preyed upon by coterie of voyeurs and Dr. Strauss.

84. OSU also permitted Dr. Strauss to continue serving as a physician for its student-athletes even after, on information and belief, removing him from the student-health center in the 1995-1996 academic year because of a student's complain about Dr. Strauss's sexual misconduct.

---

[18] 'A cesspool of deviancy': New claims of voyeurism test Jordan denials, July 6, 2018, http://www.politico.com/story/2018/07/06/jim-jordan-harassment-ohio-state-wrestling-699192 (last visited July 26, 2018).

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] See Class Action Complaint, supra n.17, ¶¶ 122-27.

85. OSU also ignored other red flags about Dr. Strauss. For example, in 1996, Dr. Strauss opened a men's clinic near OSU's campus to treat "common genital/urinary problems" – even though he was trained as a pulmonologist – and solicited male students for sexual health treatment in OSU's student newspaper. On information and belief, Dr. Strauss opened the men's clinic after OSU had removed him from working at the student health center because of a sexual misconduct complaint.

86. As athletes' complaints about Dr. Strauss multiplied, OSU finally scheduled a hearing in 1997 to address allegations of sexual misconduct against Dr. Strauss, asking some former OSU student-athletes to testify. [24]

87. Plaintiffs do not yet know if that hearing took place. But, on information and belief, OSU did not take any legal or disciplinary action against Dr. Strauss as a result of that proceeding.

88. In fact, in 1998, not long after the hearing had been scheduled to occur, Dr. Strauss retired from OSU without explanation. And OSU bestowed the honorary title of professor emeritus on him.

89. Dr. Strauss committed suicide in 2005. The effects of his abuse, and OSU's complicity in it, survive in the lives of his victims.

## OSU's "INDEPENDENT INVESTIGATION"

90. In April of 2018, approximately forty years after students first began complaining about Dr. Strauss's abuse, OSU announced that it was opening an investigation into student-athlete's allegations of sexual misconduct by Dr. Strauss dating back to the lates-1970s.

---

[24] See supra n.8.

91. OSU opened this investigation only after multiple former student-athletes publicly told their stories of Dr. Strauss's sexual abuse to the media.

92. OSU is paying Perkins Coie to conduct an "independent investigation" into allegations of Dr. Strauss's sexual misconduct and OSU's knowledge about it at the time. To date, Perkins Coie has interviewed more than 335 former students and OSU staff, including over 145 former students who reported firsthand accounts of sexual assault by Dr. Strauss.

93. Until OSU opened its investigation in April of 2018, many of the Plaintiffs did not understand that Dr. Strauss had sexually assaulted and harassed them in guise of providing necessary and appropriate medical care. And none of them knew, or had any reason to know, of the role that OSU played in facilitating Dr. Strauss's abuse. This is because OSU ignored, rebuffed, and concealed complaints about Dr. Strauss, preventing the Plaintiffs from discovering their claims against OSU.

94. The investigation and media coverage of it have retraumatized many survivors of Dr. Strauss's sexual predation, including the Plaintiffs, by dredging up repressed memories of their experiences with Dr. Strauss. And some of them have been further retraumatized by having to recount the painful details of these experiences to the Perkins Coie investigators.

95. The "independent investigation" is being done by white-collar defense attorneys at Perkins Coie, and there is no indication that they are trained in conducting trauma-informed interviews.

96. In addition, when the Perkins Coie attorneys interview a survivor, they are not preparing written statements for survivors to review and provide any needed input or correction.

97. Nor are they asking the survivors they interview about the changes the survivors think OSU should make to prevent serial predation by an OSU employee from happening again.

98. Nor are they offering the survivors any resources for counseling or other treatment.

99. OSU knows who participated in its various athletic teams from 1978 through 1998, and who Dr. Strauss saw in the student health center from 1991 through 1995, but has not taken steps to find or contact them – claiming that it does not want to retraumatize them. Instead, the Perkins Coie attorneys are only interviewing the survivors who reach out to contact them.

100. This suggests at least three things: (1) OSU knows it is likely that every male student and student-athlete examined by Dr. Strauss was sexually assaulted, that the experience was painful, and that dredging it up again will be painful; (2) OSU wants to minimize its potential liability while preserving its reputation; and (3) the Perkins Coie investigators are a team of attorneys who OSU is paying to interview a small subset of survivors and limit the extent of OSU's legal exposure.

101. In the more than six months since OSU launched this investigation, it has received detailed, credible evidence of Dr. Strauss's serial sexual predation and OSU's institutional indifference to complaints about Dr. Strauss. Nonetheless, OSU still refuses to take responsibility for what happened to so many of its students and student-athletes.

102. In short, OSU is in "damage control mode." It does not want to be held accountable for employing a serial sexual predator and perpetuating his abuse of students for two decades.

103. But enough is enough. Remedial action to help the survivors of Dr. Strauss's sexual

00565953 2

predation is long overdue, as is systemic institutional change to ensure that something like this never happens again to another OSU student.

**OSU's Pattern of Indifference to Sexual Harassment and Abuse**

104. OSU's culture of indifference to the safety and well-being of its students has caused sexual violence to flourish at OSU for the last four decades. This toxic culture, which has drawn the attention and censure of the federal government, continues to thrive to this day.

105. On June 23, 2010, the United States Department of Education's Office for Civil Rights ("OCR") initiated a review of OSU's compliance with Title IX. With the federal government peering over its shoulder, OSU rushed to revise its sexual abuse policies and procedures. [25] Nevertheless, on September 11, 2014, after a four-year-long review of OSU, OCR announced that the university had violated Title IX. [26]

106. Specifically, OCR found that OSU's policies and procedures were confusing and inconsistent, failed to designate timeframes for the completion of major stages of sexual abuse investigations, and failed to ensure that complainants were afforded equal opportunity to participate in the grievance process, in violation of Title IX. [27]

107. OCR also found that students were confused about how and where to report incidents of sexual harassment and assault. [28]

107. OCR likewise found that OSU's procedures "inappropriately suggest and, in some instances, seem to require that parties work out alleged sexual harassment directly with

---

[25] OCR Findings Letter, supra n.2 , at 24.
[26] *Id.* at 1.
[27] *Id.* at 1, 9, 26.
[28] *Id.* at 10.

the accused harasser prior to filing a complaint with the University." [29]

108. In some cases, OCR was unable even to reach a determination about whether OSU adequately responded to complaints because OSU's complaint files were so sloppy and indecipherable. [30]

109. In order to close the federal government's review, OSU entered into a resolution agreement with OCR. That agreement required OSU, in part, to disseminate information to educate students and staff about Title IX's prohibition against sexual abuse and harassment, and how to report incidents. It also required OSU to revise its policies and procedures to eliminate the requirement that students "work out" sexual harassment and abuse directly with their abuser. And it required OSU to provide mandatory training on sexual abuse to students and staff. [31]

110. After the federal government initiated its investigation into OSU's practices, OSU began its own investigation into a sexual harassment complaint concerning its Marching Band.

111. OSU's internal investigation found that the Marching Band's culture facilitated sexual harassment and created a sexually hostile environment for its students. [32] Students in the Marching Band were called sexual nicknames, like "Boob Job" and "Twinkle Dick," and

---

[29] *Id.* at 25.

[30] *Id.* at 19, 27.

[31] *Id.* at 27-29; see also Resolution Agreement, Ohio State University, OCR Docket #15-10-6002, accessible at http://www.politico.com/story/2018/07/06/jim-jordan-harassment-ohio-state-wrestling-699192 (last visited July 24, 2018).

[32] Ohio State University Investigation Report, July 22, 2014, Complaint against Jonathan Waters, Director of the OSU Marching Band, 1, accessible at http://www.documentcloud.org/documents/1235398-osu-investigation-report-complaintagainst.html (last visited July 21, 2018)(hereinafter "OSU Investigation Report").

pressured to participate in an annual nude Marching Band tradition. [33] Students felt that the Marching Band's culture was sexualized and an "old guys" club, and that it operated under a "culture of intimidation," which culminated in at least one known sexual assault as well as sexual harassment. [34] Most damningly, the investigation found that OSU had notice of the hostile environment but had failed to do anything about it. [35]

112.   A year after OCR found OSU non-compliant with Title IX, the university launched an initiative designed to "ensure Ohio State is a national leader" in preventing and responding to sexual abuse.[36]

113.   If only OSU's actions were as good as its words.

114.   In 2014, during a diving meet, OSU received a report that OSU assistant diving coach Will Bohonyi was sexually abusing a minor in OSU's Diving Club. Inexplicably, OSU allegedly sent the victim—not the perpetrator—home from the meet. [37]

115.   OSU then allegedly failed to take action to address the hundreds of naked photographs of the  victim engaged in sexual acts that Coach Bohonyi had forced her to take. [38] These photographs- child pornography – have allegedly sat in OSU's possession for some four years. [39]

---

[33] *Id.* at 4-5
[34] *Id.* at 11-12
[35] OCR Findings Letter, supra n.2, at 2; OSU Investigation Report at 1.
[36] OSU Plan, supra n.3.

[37] *Id.* Diving Complaint, supra n.4, ¶¶ 272, 274-75.
[38] *Id.* at ¶¶ 176-180, 260-62.
[39] *Id.* at ¶ 180

116. Revelations of OSU's ongoing culture of abuse continue to accumulate. For instance, in
June of 2018, OSU was forced to shutter its sexual assault prevention and response unit
after concerns emerged that unit employees had told victims of abuse they were "lying,"
"delusional," and had "an active imagination." [40] Other victims were denied services
because they would not disclose the identity of their attackers. [41] OSU indicated that the
unit also failed to document and report sexual assaults in a timely way. [42]

117. On August 8, 2018, OCR initiated yet another investigation into OSU' compliance with
Title IX – this time involving OSU's response to students' allegations of sexual
misconduct by Dr. Strauss, the subject of the lawsuit.

118. Despite all evidence to the contrary—a federal investigation finding Title IX violations,
numerous student complaints, internal reports, witnesses, and more- OSU persists in
claiming it is and has been "a leader" on issues of sexual abuse. [43] The survivors of its four
decades of indifference beg to differ.

## SPECIFIC FACTUAL ALLEGATIONS

---

[40] Ohio State closes sexual-assault center, fires 4 after complaints, June 20, 2018,
http://www.dispatch.com/news/20180619/ohio-state-closes-sexual-assault-center-fires-4-aftercomplaints (last
visited July 26, 2018); A Broken System at Ohio State, July 10, 2018,
http://www.insidehighered.com/news.2018/07/10/ohio-state-closes-sexual-assault-unit-aftercomplaints-
mismanagement-poor-reporting (last visited July 26, 2018); see also Ohio State dissolves Sexual Civility and
Empowerment unit, June 19, 2018, accessible at https://news.osu.edu/ohio-state-dissolves -sexual-civility-and-
empowerment-unit/ (last visited July 17, 2018).

[41] See supra n.40, A Broken System at Ohio State.
[42] Id.
[43] Id.

00565953 2

119.  Plaintiffs incorporate by reference the allegations in all previous paragraphs as if

fully stated here.

### JOHN DOE R.F.

120.   John Doe R.F. was a member of both Defendant OSU's wrestling and football teams

from 1993 through 1995 until he became ill. R.F. was a two-time high school state

champion and compiled a 37-2 record in his senior year.

121.   John Doe R.F.  was treated by Dr. Strauss on or about ten times between 1993 and 1995,

in Larkins Hall.

122.   John Doe R.F.  was referred to Dr. Strauss by his coaches Jim Jordan and Russ

Hellickson when he was caused to seek treatment for a knee injury, stitches in his head,

and  athletic physicals.

123.   That during approximately 7 of the 10 times he was examined by Dr. Strauss, Dr. Strauss

inspected John Doe R.F.'s penis, including pulling and groping which appeared to be

trying to perform masturbation on John Doe R.F.

124.   That Dr. Strauss would tell John Doe R.F.  that an erection during such examination was

"completely normal".

125.   John Doe R.F.  became uncomfortable with the length and intrusiveness of Dr. Strauss's

exam.

126.  John Doe R.F.  and his teammates sometimes talked about Dr. Strauss's examinations and

there was an understanding between them that something was not right with Dr. Strauss.

127. John Doe R.F. did not know that Dr. Strauss's examination of

him was, in fact, sexual assault. And even if John Doe R.F. had understood that Dr.

Strauss's conduct constituted sexual assault, he had no reason to know of the role OSU had

played in facilitating the sexual assault.

128.   While John Doe R.F.  was an OSU student, he trusted that OSU would not allow him to be

harmed. So, even though he felt very uncomfortable during Dr. Strauss's examination,

thought it was inappropriate, and complained about it with teammates, John Doe R.F.  did

not understand or believe that Dr. Strauss had sexually abused him.

129.   This is because, while John Doe R.F.  attended OSU, he reasonably believed that OSU

would not have hired Dr. Strauss, or sent Franklin and other athletes to see Dr. Strauss

unless Dr. Strauss's examinations were legitimate.

130.   John Doe R.F. did not know, or have reason to know

that Dr. Strauss's serial sexual abuse of OSU students, John Doe R.F. did not know, or have

reason to know, that Dr. Strauss had sexually abused him and other student-athletes or that

OSU had failed to take appropriate steps to stop Dr. Strauss's abuse.

131.   If OSU had taken meaningful action to address any prior reports of Dr. Strauss's

sexual abuse, John Doe R.F.  would not have been abused by Dr. Strauss.

132. As a result of Dr. Strauss's abuse and OSU's failure to prevent or address it, John Doe R.F. has suffered emotional and psychological damages and was forced to transfer out of OSU due to humiliation, anxiety and emotional distress.

### JOHN DOE J.S.

133. John Doe J.S. was an undergraduate student at OSU from 1992 through his graduation in 1995.

134. During the summer of 1994, John Doe J.S. presented to the OSU student health center to be treated for an illness.

135. While in the exam room, Dr. Strauss had John Doe J.S. undress.

136. That while John Doe J.S. was standing in front of Dr. Strauss, Dr. Strauss ran his hands over John Doe J.S.'s chest and shoulders before proceeding to walk around to John Doe J.S.'s rear where he grabbed John Doe J.S.'s chest from behind.

137. Dr. Strauss commented on John Doe J.S.'s body and how he was in such good shape and must've worked out.

138. Dr. Strauss continued to run his hands down John Doe J.S.'s arms.

139. Dr. Strauss instructed John Doe J.S. to lie down on the examination table at which time Dr. Strauss began to examine John Doe J.S.'s genitals.

140. That Dr. Strauss removed his gloves and explained that it was so he could "get a better feel of things and it allowed for a more thorough examination".

141.  That Dr. Strauss began stroking John Doe J.S.'s penis in an attempt to masturbate John Doe J.S.

142.  John Doe J.S. did not know, or have reason to know, of OSU'S role in Dr. Strauss's sexually abusive medical examinations of him or that other students had previously complained to OSU about Dr. Strauss's abuse.

143.  John Doe J.S. had no reason to investigate whether OSU – in addition to Dr. Strauss – had harmed him.

144.  If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe J.S. would not have been abused by Dr. Strauss.

145.  As a result of Dr. Strauss's abuse and OSU's failure to prevent it, John Doe J.S. has suffered emotional and psychological damages, including but not limited to the shame and guilt he lives with for not personally reporting the abuse and allowing Dr. Strauss to assault others.

**JOHN DOE S.G.**

146.  John Doe S.G. was a student at OSU from the summer of 1994 until his graduation in May 1995.

147.  That in the fall of 1994, John Doe S.G. sought treatment at the OSU student health center for occurrences of HPV warts.

148.  That Dr. Strauss initially met with John Doe S.G. in his private office where Dr.

Strauss sat behind his desk and provided John Doe S.G. with medical information about

the virus he was being treated for.

149.   That Dr. Strauss spoke to John Doe S.G.  in a kind and comforting nature, but combined

such with course, and crude language that John Doe S.G. found to be unusual for a

doctor.

150.   That upon entering the examination room, John Doe S.G. was asked to undress.

151.   That Dr. Strauss insisted on "giving a thorough exam" despite John Doe S.G.'s

specific indication of the affected areas requiring treatment.

152.   Dr. Strauss began to closely examine John Doe S.G.'s penis and testicles, while squinting

his eyes and breathing very close to his genitals.

153.   Dr. Strauss began to do what can be described as attempting to masturbate John Doe S.G.

154.   That John Doe S.G. pushed Dr. Strauss away from him while Dr. Strauss appeared to be

very pleased.

155.   That Dr. Strauss performed the necessary procedure and John Doe S.G. never went back

to see him after finding the encounter unusual and creepy.

156.   While John Doe S.G.  was an OSU student, he trusted that OSU would not allow him to

be harmed. So, even though he felt uncomfortable during Dr. Strauss's examination, John

Doe S.G. did not understand or believe that Dr. Strauss had sexually abused him.

157.   John Doe S.G.  reasonably believed that OSU would not have made Dr. Strauss the

athletic team doctor or physician on campus unless Dr. Strauss's examinations were legitimate.

158.  John Doe S.G. did not know, or have reason to know, of OSU's role in Dr. Strauss's sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss's abuse. Nor did he have reason to investigate whether OSU- in addition to Dr. Strauss – had harmed him.

159.   Even if, while John Doe S.G.  was an OSU student, he had tried to inquire further  into OSU's role in Dr. Strauss's conduct, the inquiry would have been futile, as OSU controlled access to that information.

160.   John Doe S.G. did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss's serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss's abuse.

161.   If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe S.G. would not have been abused by Dr. Strauss.

162.  As a result of Dr. Strauss's abuse and OSU's failure to prevent it, John Doe S.G.  has

suffered emotional and psychological damages. John Doe S.G. has lost trust in male medical professionals and is trying to cope with learning the extent of OSU's involvement in covering up Dr. Strauss's sexual abuse.

## JOHN DOE D.L

163.    John Doe D.L. was a student at OSU from 1991 through 1994 during which time he was

a walk-on athlete on the wrestling team.

164.    While John Doe D.L. was on the wrestling team, Russ Hellickson was the head coach,

and Jim Jordan and Marc Coleman were assistant coaches.

165.    While John Doe D.L. was on the wrestling team in the fall of 1991, he injured his knee

during a tournament in West Virginia

166.    Because Dr. Strauss was the team doctor, John Doe D.L. saw Dr. Strauss for his knee

injury.

167.    During the examination, Dr. Strauss pulled out a strange instrument that he claimed was

for acupuncture.

168.    Instead of commencing treatment on his knee, Dr. Strauss began fondling John Doe

D.L.'s penis in an attempt to achieve an erection and/or ejaculation.

169.    That John Doe D.L. was once again treated by Dr. Strauss in the fall of 1993 for what

John Doe D.L. suspected was a sexually transmitted disease.

170.    That during that examination, Dr. Strauss who was not wearing gloves manipulated John

Doe D.L.'s testicles for what seemed to be an unnecessary long time, rubbed his penis in

an attempt to masturbate John Doe D.L., and digitally penetrated his anus.

171.    While John Doe D.L. was on the wrestling team, his teammates also talked about how

Dr. Strauss hung out in the shower, sauna and locker room at Larkins Hall to watch the

male athletes and to masturbate.

172. John Doe D.L. felt that the way in which Dr. Strauss conducted his physical examination

and showered with the athletes was strange, but John Doe D.L. did not realize at the time

that Dr. Strauss was sexually abusing and harassing him and his teammates.

173. John Doe D.L. was never informed or made aware of any OSU grievance procedure to

complain about Dr. Strauss and did not believe there was any recourse for what happened

to him.

174. In retrospect, John Doe D.L. realizes that Dr. Strauss sexually abused and harassed him

and his teammates.

175. While John Doe D.L. was an OSU student, he trusted that OSU would not allow him to

be harmed. So, even though he felt uncomfortable during Dr. Strauss's examination, John

Doe D.L. did not understand or believe that Dr. Strauss had sexually abused him.

176. John Doe D.L. reasonably believed that OSU would not have made Dr. Strauss the

athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr.

Strauss's examinations were legitimate.

177. John Doe D.L. did not know, or have reason to know, of OSU's role in Dr. Strauss's

sexually abusive conduct or that other athletes had previously complained to OSU about

Dr. Strauss's abuse. Nor did he have reason to investigate whether OSU – in addition to

Dr. Strauss – had harmed him.

178.    This is because, in John Doe D.L.'s experience, Dr. Strauss's conduct during

examinations and in the locker room was common knowledge among trainers and

coaches, but none of them seemed particularly concerned about is.

179.    In any event, even if, while John Doe D.L. was an OSU student, he had tried to inquire

further into OSU's role in Dr. Strauss's conduct, the inquire would have been futile, as

OSU controlled access to that information.

180.    John Doe D.L. did not know, or have reason to know, that Dr. Strauss has

sexually abused him, that OSU had known about Dr. Strauss's serial sexual abuse, or

that OSU had failed to take appropriate steps to stop Dr. Strauss's abuse.

181.    If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual

abuse, John Doe D.L. would not have been abused by Dr. Strauss.

182.    That Dr. Strauss's conduct was a factor in John Doe D.L.'s decision to transfer out of

OSU.

183.    As a result of Dr. Strauss's abuse and OSU's failure to prevent it, John Doe D.L. has

suffered emotional and psychological damages, and alcohol dependency to deal with the

anxiety and depression caused by his experience.

### JOHN DOE M.B.

184.    John Doe M.B. was a student at OSU from 1985 through his graduation in 1991.

185.  That John Doe M.B., was a walk-on on the OSU wrestling team his sophomore and

junior years at OSU.

186.  While John Doe M.B. was on the wrestling team, Russ Hellickson was the head coach

and Jim Jordan was the assistant coach.

187.  Dr. Strauss was the team doctor while John Doe M.B. was on the wrestling team, and

the wrestling trainers sent John Doe M.B. to see Dr. Strauss at Larkins Hall his

sophomore year for cauliflower ear.

188.  During the exam of his ear, Dr. Strauss was very hands on and insisted on doing a

complete body examination.

189.  Dr. Strauss did not wear gloves during the exam.

190.  During the exam of what should have been for his ear exclusively, Dr. Strauss touched

and rubbed John Doe M.B.'s naked torso in a manner that made John Doe M.B.

extremely uncomfortable.

191.  Dr. Strauss's touching and comments to John Doe M.B. were embarrassing, deeply

unsettling, and traumatizing.

192.  That John Doe M.B. mentioned his encounter with Dr. Strauss to his teammates, but

they already knew about his inappropriate touching.

193.  Because Coach Hellickson, Assistant Coach Jordan, and the athletic department treated

Dr. Strauss's behavior as acceptable, John Doe M.B. believed there was nothing he

could do to address his discomfort with Dr. Strauss.

194.   John Doe M.B. felt that Dr. Strauss's examinations and conduct were strange, but did

not realize at the time that Dr. Strauss was sexually abusing and harassing him and his t

teammates.

195.   John Doe M.B. was never informed or made aware of any OSU grievance procedure to

complain about Dr. Strauss and did not believe there was any recourse for what

happened to him.

196.   John Doe M.B. did not think that complaining was an option given that everyone

seemed to know about it and accepted Dr. Strauss's behavior as normal.

197.   In retrospect, John Doe M.B. realizes that Dr. Strauss sexually abused and harassed

him  and his teammates.

198.   While John Doe M.B. was an OSU student, he trusted that OSU would not allow him

to  be harmed. So, even though he felt uncomfortable during Dr. Strauss's

examination,     John Doe M.B. did not understand or believe that Dr. Strauss had

sexually abused him.

199.   John Doe M.B. reasonably believed that OSU would not have made Dr. Strauss the

athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr.

Strauss's examinations were legitimate.

200. John Doe M.B. did not know, or have reason to know, of OSU's role in Dr. Strauss's sexually abusive conduct or that other athletes had previously complained to OSU about Strauss's abuse. Nor did he have reason to investigate whether OSU – in addition to Dr. Strauss – had harmed him.

201. Even if, while John Doe M.B. was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss's conduct, the inquiry would have been futile, as OSU controlled access to that information.

202. John Doe M.B. did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss's serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss's abuse.

203. If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe M.B. would not have been abused by Dr. Strauss.

204. As a result of Dr. Strauss's abuse and OSU's failure to prevent it, John Doe M.B. has suffered emotional and psychological damages. In addition, after injuring his knee during wrestling, John Doe M.B. chose to quit the team rather than endure any additional "treatment" by Dr. Strauss.

## JOHN DOE M.W.

205.  John Doe S.G. was a student at OSU from the fall of 1990  until his graduation in
May 1995.

206.  That in the fall of 1992, John Doe M.W. sought treatment at the OSU student health
center for occurrences of HPV warts.

207.  That upon entering the examination room, John Doe M.W. was asked to undress
with no one else in the room observing.

208.  That Dr. Strauss insisted on "giving a thorough exam" despite John Doe M.W.'s
specific indication of the affected areas requiring treatment.

209 . Dr. Strauss began to closely examine John Doe M.W.'s penis and testicles, while
squinting  his eyes and breathing very close to his genitals.

210.  Dr. Strauss began to do what can be described as attempting to masturbate John
Doe M.W.

211.  Dr. Strauss also commented on and questioned John Doe M.W.'s sexuality and
required him to be naked at each of his 7 – 10 medical visits.

212.  While John Doe M.W.  was an OSU student, he trusted that OSU would not allow
him to be harmed. So, even though he felt uncomfortable during Dr. Strauss's
examination, John  Doe M.W. did not understand or believe that Dr. Strauss had
sexually abused him.

213.  John Doe M.W.  reasonably believed that OSU would not have made Dr. Strauss the

athletic team doctor or physician on campus unless Dr. Strauss's examinations were legitimate.

214.   John Doe M.W. did not know, or have reason to know, of OSU's role in Dr. Strauss's  sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss's abuse. Nor did he have reason to investigate whether OSU- in addition to Dr. Strauss – had harmed him.

215.   Even if, while John Doe M.W.  was an OSU student, he had tried to inquire further into  OSU's role in Dr. Strauss's conduct, the inquiry would have been futile, as OSU  controlled access to that information.

216.   John Doe M.W. did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss's serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss's abuse.

217.   If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe M.W. would not have been abused by Dr. Strauss.

218.   As a result of Dr. Strauss's abuse and OSU's failure to prevent it, John Doe M.W. has suffered emotional and psychological damages including guilt and embarrassment John Doe M.W. has lost trust in male medical professionals and is trying to cope with learning the extent of OSU's involvement in covering up Dr. Strauss's sexual abuse.

## CLAIMS FOR RELIEF
## COUNT I
### Violation of Title IX, 20 U.S.C. § 1681(a), et seq.

**Creation of Sexually Hostile Culture/Heightened Risk of Sexual Harassment**

219.  Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully

stated here.

220. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a),

states: "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving Federal financial assistance…."

221. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part

106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance

procedures providing for prompt and equitable resolution of student and employee

complaints alleging any action which would be prohibited by this part."

222. As explained in Title IX guidance issued by the U.S. Department of Education's Office

for Civil Rights, sexual harassment of students is a form of sex discrimination covered

by Title IX.

223. Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome

sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical

conduct of a sexual nature.

224. Title IX covers all programs of a school that receives any federal financial assistance,

and covers sexual harassment – including sexual assault – by school employees,

students, and third parties.

225.  Title IX requires OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

226.  Dr. Strauss was an OSU employee whose actions were carried out as an assistant medical professor, athletic team doctor, and physician at OSU.

227.  Dr. Strauss's sexual harassment of Plaintiffs (and other OSU students)—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments – was sex discrimination under Title IX.

228.  Dr. Strauss's sexual harassment of Plaintiffs (and other OSU students) was rampant, occurring regularly on campus and sometimes at his home, for two decades.

229.  OSU had actual knowledge of Dr. Strauss's serial sexual harassment and permitted it to  continue unchecked throughout Dr. Strauss's employment.

230.  Throughout Dr. Strauss's 20-year tenure at OSU, students, student-athletes, and coaches  conveyed complaints and concerns to OSU administrators and employees about Dr.  Strauss's inappropriate conduct.

231.  Specifically, OSU was notified about Dr. Strauss's sexual harassment through OSU employees with authority to take corrective action to address it. These OSU employees include, but are not limited to: former Director of Student Health Services, Ted Grace,

M.D.; former Athletic Director and Assistant University Vice President Andy Geiger; former Assistant Athletic Director Archie Griffin; former Athletic Director Hugh Hindman; former Associate Sports Information Director Steve Snapp; former Assistant Athletic Director Richard Delaney; former Co-Head Athletic Trainer Billy Hill; former Head Wrestling Coach Russ Hellickson; former Head Tennis Coach John Daly; former Head Track and Field Coach Frank Zubovich; former Head Swimming Coach Dick Sloan; and former Head Fencing Coach Charlotte Remenyik.

232. Upon information and belief, former Head Wrestling Coach Russell Hellickson publicly stated in 2018 that, during his tenure at OSU, it was widely known that Dr. Strauss was engaging in improper sexual conduct with students. Upon information and belief, Coach Hellickson also publicly stated in 2018 that, during his tenure at OSU, it was widely known that Dr. Strauss was engaging in improper sexual conduct with students. Upon information and belief, Coach Hellickson also publicly stated in 2018 that he reported Dr. Strauss's sexual misconduct to higher authorities at OSU, but they did nothing.

233. Upon information and belief, former Head Fencing Coach Charlotte Remenyik also reported Dr. Strauss's suspected sexual abuse to higher authorities at OSU.

234. Given the magnitude of Dr. Strauss's abuse—involving students and student athletes he evaluated and treated over the span of two decades – it would be implausible for OSU to claim that it did not know about Dr. Strauss's sexual abuse.

235. OSU was required to promptly investigate and address Plaintiffs' (and other OSU

students') allegations, reports and/or complaints of unwelcome, inappropriate touching and comments by Dr. Strauss, but OSU did not do so.

236.    After Plaintiff Snyder-Hill notified former Director of Student Health Services, Dr. Ted Grace, about Dr. Strauss's sexual abuse, Dr. Grace assured Snyder-Hill that OSU would document and retain any future complaints about Dr. Strauss. But OSU's personnel file on Dr. Strauss does not even mention Snyder-Hill's complaint.

237.    Upon information and belief, OSU scheduled a hearing in 1997 to address allegations of sexual misconduct by Dr. Strauss, but did not impose any discipline on Dr. Strauss. Instead, OSU gave Dr. Strauss the honorary title of Professor Emeritus and allowed him to retire in 1998.

238.    OSU created and was deliberately indifferent to a sexually hostile culture within its athletic and student health programs, by, among other things:

   a.    Mishandling students' reports about Dr. Strauss's conduct and/or discouraging students from reporting Dr. Strauss's conduct;

   b.    Failing to promptly and appropriately investigate, remedy, and respond to complaints about Dr. Strauss's conduct;

   c.    Promoting Dr. Strauss and increasing his access to OSU students, despite students' complaints about Dr. Strauss's conduct;

    d.   Failing to adequately supervise Dr. Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

    e.   Failing to take corrective action to prevent Dr. Strauss from sexually harassing other students;

f.   Requiring student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships – even after student-athletes complained to athletic directors, coaches, and trainers about the ways Dr. Strauss touched them during medical examinations;

g.  Threatening male athletes' participation in OSU sports if they refused to get physicals and/or medical treatment from Dr. Strauss;

h.  Joking about Dr. Strauss's conduct with student-athletes;

i.  Permitting Dr. Strauss to ogle male student-athletes at Larkins Hall while they showered;

j.  Permitting Dr. Strauss to shower with student-athletes for hours at a time, several times a day;

k.  Falsely representing to at least one student who reported sexual harassment by Dr. Strauss that there had been no prior complaints about Dr. Strauss and that Student Health had only received positive comments about Dr. Strauss; and

l.  Permitting a toxic, sexualized culture to thrive at Larkins Hall, where a cohort of older male "voyeurs" gathered to gawk at male student-athletes and masturbate while watching them shower.

239.  OSU's creation of and deliberate indifference to the sexually hostile culture within its

athletic and student health programs substantially increased the risk that Plaintiffs and

other OSU students would be sexually harassed.

240.  The sexual harassment that Plaintiffs suffered was so severe, pervasive and objectively

offensive that it effectively barred their access to educational opportunities and

benefits, including a safe educational environment and appropriate medical care.

241.  As a direct and proximate result of OSU's creation of and deliberate indifference to a

sexually hostile educational environment, which violated Title IX, Plaintiffs have

suffered and continue to suffer damages and injuries.

## COUNT II
### Violation of Title IX, 20 U.S.C. § 1681(a), et seq.
### Deliberate Indifference to Prior Sexual Harassment

242.  Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully

stated here.

243.  Before Dr. Strauss sexually harassed most, if not all, of the Plaintiffs, OSU had actual

knowledge of Dr. Strauss's prior sexual harassment of male students at OSU.

244.  Based on Dr. Strauss's prior conduct, OSU had actual knowledge of the substantial risk

that Dr. Strauss would sexually harass other male students at OSU.

245.  OSU officials, with the knowledge described above, had the authority to address the

risk posed by Dr. Strauss, and had the authority to take corrective measures by, among other things, closely supervising Dr. Strauss, not allowing him to examine students without another medical professional present, not allowing him to shower with student-athletes, or terminating his employment.

246. OSU's failure to address the substantial risk posed by Dr. Strauss, given prior complaints and reports about his inappropriate conduct, was clearly unreasonable in light of the known circumstances.

247. By its acts and omissions, OSU was deliberately indifferent to the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

248. As a result of OSU's deliberate indifference, Plaintiffs were subjected to severe sexual harassment by Dr. Strauss, including sexual assault in the guise of medical care.

249. The sexual harassment that Plaintiffs suffered was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

250. As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss's prior sexual harassment of male students at OSU, which violated Title IX, Plaintiffs have suffered and continue to suffer damages and injuries.

**COUNT III**

## FRAUDULENT CONCEALMENT
## BY THE OHIO STATE UNIVERSITY

251. Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs.

252. Plaintiffs hereby allege that OSU committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims, by making material representations to Plaintiffs involving a past or existing fact at the time of Dr. Strauss' sexual assaults, by representing:

    a.    Defendant Strauss' examinations were "medically appropriate";

    b.    Defendant Strauss's conduct was "not sexual abuse,"

    c.    Continuing to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual predator despite actual and/or constructive knowledge that he was a sexual predator who engaged in acts of sexual abuse with minors at the OSU Student Health Center and Larkins Hall;

253. The material representation(s) to Plaintiffs were false, in that OSU had actual knowledge of sexual abuse by Dr. Strauss from other students and student athletes on the OSU campus and knew that the appropriateness of his "treatment[s]" had been questioned in the past, however, but continued to employ Dr. Strauss, thereby providing him unfettered access to hundreds of minor males including Plaintiffs.

254. OSU made the material representation(s), they knew that they were false and/or made the material representation(s) recklessly, without any knowledge of their truth and as a positive assertion, in that they had actual knowledge of sexual abuse by Dr. Strauss

00565953 2

from other students and student athletes on the OSU campus and knew that the appropriateness of his "treatment[s]" had been questioned in the past however continued to employ Dr. Strauss thereby providing him unfettered access to hundreds of minor males including Plaintiffs.

255. OSU made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

    a.      should believe that the "treatments" were in fact "treatments;"

    b.      should believe that the "treatment[s]" were proper, appropriate, and legitimate;

    c.      should not believe that he had been sexually assaulted;

    d.      should not question and/or report the conduct to other authorities;

    e.      should believe that Dr. Strauss was a legitimate doctor who did not commit sexual assault; and,

    f.      should not reasonably believe and not be aware of a possible cause of action that they have against OSU.

256. Plaintiffs acted in reliance upon the material representation(s), in that Plaintiffs:

    a.      reasonably believed that the "treatments" were in fact "treatments;"

    b.      reasonably believed that the "treatments" were proper, appropriate, and legitimate;

    c.      reasonably did not believe that they had been sexually assaulted;

    d.      reasonably believed that they should continue the "treatment[s];"

e.      reasonably believed that Dr. Strauss was a legitimate doctor who did not engage in sexual assault;

f.      did not believe that they should question and/or report the conduct to appropriate authorities; and,

g.      did not believe that they had and were not aware of a possible cause of action that they had against OSU.

257.   Plaintiffs thereby suffered injury, in that Plaintiffs:

a.      could not stop the sexual assault;

b.      continued to undergo the "treatment[s]" and sexual assaults;

c.      and suffered related physical manifestations thereof, sleep deprivation, physical illness, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

258.   OSU concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they made a material representation(s) to Plaintiffs involving a past or existing fact by:

a.      they should believe that the "treatments" were in fact "treatments;"

b. they should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c. they should not believe that he had been sexually assaulted;

d. they should not question and/or report the conduct to other authorities;

e. they should believe that Dr. Strauss was a legitimate doctor who did not commit sexual assault; and,

f. they continued to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual predator despite actual and/or constructive knowledge that he was a sexual predator who engaged in acts of sexual abuse with minors at the OSU Student Health Clinic and Larkins Hall;

259. OSU concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they:

a. ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Dr. Strauss's "treatments;"

b. did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers presence during an examination of a minor by a physician; and,

c. continuing to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual predator despite actual and/or constructive

knowledge that he was a sexual predator who engaged in acts of sexual abuse with minors on the OSU campus and in its student health center;

260. Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against OSU until publication of the investigation in 2018.

a. Plaintiffs reasonably relied on the Fraud committed by OSU by the material representations and concealment of the true nature of Dr. Strauss's "treatments[s]"and his actions;

b. Plaintiffs did not know what a legitimate and appropriately performed genital or hernia treatment was like because they had never experienced and/or had such treatment before and such examinations were not medically necessary at any relevant time;

c. Due to the fraudulent representations by Dr. Strauss to Plaintiffs, Plaintiffs did not know and/or understand that they were not being medically treated but instead were being sexually assaulted;

d. Plaintiffs could not have possibly known because; at times, there were no parents, chaperones, guardians, caregivers, and/or other medical professionals in the room during the "treatments" to observe, question, and/or discover that his "treatments" were sexual assaults and inform Plaintiffs that they had been sexually assaulted and had a cause of action against OSU and OSU concealed his abuse;

e.     Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 23;

f.     Plaintiffs were young athletes, therefore were easily suggestible; and,

g.     Plaintiffs had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Dr. Strauss;

h.     Plaintiffs reasonably relied on the Fraud committed by OSU by their material representations and concealment of the true nature of Dr. Strauss's "treatments[s]"and his actions;

i.     Plaintiffs trusted OSU that they would protect Plaintiffs from harm and not hire, employee, and/or retain a physician that had, was, or would perform illegitimate and/or inappropriate "treatment[s]," engage in inappropriate conduct, and/or sexually assault patients, students, and/or athletes;

j.     Plaintiffs were never told by OSU that Dr. Strauss's conduct and "treatment[s]" were inappropriate and sexual assault, to the contrary Plaintiffs were told that Dr. Strauss's conduct and "treatment[s]" were appropriate and legitimate "treatment[s]," "not sexual abuse," "medically appropriate," and "[n]ot of a sexual nature".

k.     Plaintiffs reasonably relied on OSU to protect them.

261.   The actions and inactions of OSU, as described in the preceding paragraphs, constituted Fraudulent Concealment.

00565953 2

262.   At all times pertinent to this action, Dr. Strauss was an agent, apparent agent, servant, and employee of OSU and operated within the scope of his employment and his Fraudulent Concealment is imputed to OSU.

263.   The actions and inactions of the sports medicine trainers, trainers, coaches, assistant coaches, employees, staff, managers, supervisors, and directors of OSU, as described in the preceding paragraphs, constituted Fraudulent Concealment.

264.   At all times pertinent to this action, the sports medicine trainers, trainers, coaches, assistant coaches, employees, staff, managers, supervisors, and directors of OSU, were agents, apparent agents, servants, and employees of OSU, and operated within the scope of their employment and their Fraudulent Concealment is imputed to OSU.

265.   At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

266.   The acts and/or omissions of OSU were willful, wanton, reckless, malicious, oppressive, and/or done with a conscious or reckless disregard for the constitutional rights of Plaintiffs.  Plaintiffs therefore request an award of punitive and exemplary damages. Plaintiffs have retained private counsel to represent them in this matter and are entitled to an award of attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Enter judgment in favor of Plaintiffs on their discrimination claims under Title IX;

(b)  Enter judgment against Defendant The Ohio State University;

(c)  Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(d)  Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain   and suffering, ongoing mental anguish, loss of  past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(e)  Award Plaintiffs pre-judgment and post-judgment interest;

(f)  Award Plaintiffs their court costs and expenses, including attorneys' fees, pursuant to U.S.C. § 1988(b); and

(g)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ Robert J. Lantzy

ROBERT J. LANTZY 0078643
29000 Inkster Road, Ste. 150
Southfield, MI  48034
248-569-4646 – phone
248-569-6737 – fax
robert@buckfirelaw.com

00565953 2